Joseph KENNELLY and Michael
Kennelly

v.

Richard D. LEMOI and Randall
A. Paulhus.

Civ. A. No. 76–0284.

United States District Court,
D. Rhode Island.

Nov. 20, 1981.

against certain municipal officials of the Town of New Shoreham.

The evidence revealed that Michael and Joseph Kennelly were apprehended for allegedly stealing beer mugs from a bar on Block Island, Rhode Island. The two boys were taken to the local police station by the Town of New Shoreham police. After being questioned and reprimanded by the local police, they began to leave the police station. On their way out, they were detained by the defendants, two state police officers who were entering the local police station. The state police officers further questioned them and then threatened the boys. Both Lemoi and Paulhus were found to have struck Michael Kennelly. Only Lemoi was found to have struck Joseph Kennelly. Both boys received injuries, but none were of a long-term or lasting nature. There was no evidence of significant hospital treatment or expenses. In fact, the hospital expenses totalled a scant $35.00. The injuries Joseph Kennelly suffered, however, did prevent him from practicing football for approximately two weeks.

Upon this evidence, the jury decided not to award any punitive damages, but did award $25,000.00 as compensatory damages. The award, subsequently reduced by this Court to $10,000.00, was affirmed by the First Circuit.

The case was originally brought against these two defendants and the Town of New Shoreham, its Treasurer, Police Chief and one of its police officers. The municipal defendants were dismissed from the case at the conclusion of the plaintiffs' evidence.

Mitchell S. Riffkin, Providence, R. I., for plaintiffs.

Eileen Cooney, Sp. Asst. Atty. Gen., State of R. I., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

In this police brutality case brought under 42 U.S.C. § 1983, the jury found that the defendants, state policemen, violated the civil rights of plaintiff Michael Kennelly. The jury also found defendant Lemoi alone guilty of violating the civil rights of Michael's brother Joseph J. Kennelly. The plaintiffs now move, pursuant to 42 U.S.C. § 1988, for an award of attorneys' fees.

There is no dispute that an award can be made for both the trial and appellate phases of the case. The defendants object only to: 1) the hourly rate requested by counsel and 2) the hours spent by counsel on ultimately unsuccessful claims originally asserted

### Objection to the Hourly Rate

Defendants, in their memorandum, do not question the hourly rates charged by attorneys in this community and as awarded to counsel by me in *Palmigiano v. Garrahy*, 466 F.Supp. 732 (D.R.I.1979), and *Lamphere v. Brown University*, 71 F.R.D. 641 (D.R.I. 1979), *aff'd* 610 F.2d 46 (1st Cir. 1979). Rather, they contrast the specialized expertise and experience in Civil Rights litigation of the *Palmigiano* and *Lamphere* attorneys with plaintiffs' counsel in this case; it is

their contention that here the attorney is not entitled to a like amount because he has been involved in only "three civil rights cases—one of which was referred out." They go on to argue that counsel "is requesting an hourly fee of $75.00 for in-court and $70.00 for out-of-court time (the amounts awarded in *Palmigiano* and *Lamphere*) . . . . [T]o support the rate requested [he] relies upon the fact that he has been in practice since 1969, a practice primarily concentrated in domestic relations and personal injury cases."

In *Palmigiano* this Court stated that "the number of years before the bar is not the touchstone that determines the worth of an attorney's fee." *Palmigiano* at 741. Relying on this language, defendants conclude that plaintiffs' counsel should receive an award "somewhat lower" than that in *Palmigiano*.

The *Palmigiano* citation is not persuasive; the statement was made in the context of a young attorney's entitlement to a fair and reasonable fee. "If a young attorney demonstrates . . . skill and ability, he should not be penalized for only recently being admitted to the bar." *Id.* at 741. Of course, longevity *per se* should not dictate the higher fee. Rather, the stature of the attorney in the community, the trial experience he has acquired, even if not as a specialist in the particular field, and the skill with which the case was presented are all to be considered. Furthermore, a large number of cases that one has tried in a certain area does not necessarily entitle one to a large fee. Considering all factors, the question is whether counsel is requesting a fair and reasonable fee.

Assuming that *Palmigiano* and *Lamphere* have set the present ceiling, it is the facts of this particular case and not counsel's lack of extensive prior exposure to this type of litigation that must reduce the rate. In the trial of this controversy, I witnessed a skilled, finished, experienced advocate who represented his client in exemplary fashion. He was thoroughly knowledgeable in the applicable law and learned in trial tactics and procedures. All other matters being equal, he would be entitled to no less a fee than was awarded in *Lamphere* and *Palmigiano*.

*King v. Greenblatt*, 560 F.2d 1024 (1st Cir. 1977), sets out the criteria that I must adhere to in this case. *Greenblatt* instructs the Court to arrive at a figure which will be adequate enough to "attract competent counsel." In determining this figure, the Court must "be governed by the same standards which prevail in other types of equally complex Federal litigation such as antitrust cases."[1] *Greenblatt* also suggests that the Court consider twelve different factors.[2] Unquestionably, the application of these factors is no easy task; no single criterion is controlling. "[I]t is not enough for the court to multiply a fixed rate by the number of hours claimed. The court must satisfy itself of the overall fairness and reasonableness of the fee under all the circumstances." *Lund v. Affleck*, 587 F.2d 75, 77 (1st Cir. 1978). What is reasonable is not subject to easy definition; after analyzing all pertinent elements, the conclusion is a rather subjective finding by the Court.

---

1. S.Rep.No. 1011, 94th Cong. 2d Sess. *reprinted in* [1976] U.S.Code Cong. & Adm.News 5908, 5913; H.Rep.No. 1558, 94th Cong. 2d Sess. 9 [1976]. *Accord, King v. Greenblatt, supra,* at 1026.

2. These factors are:
   1) The time and labor required.
   2) The novelty and difficulty of the questions presented.
   3) The skill required to perform the legal services properly.
   4) Preclusion of other employment by attorney due to acceptance of the case.
   5) The customary fee in the community.
   6) Whether the fee was fixed or contingent.
   7) The time limitations imposed by the client or circumstances.
   8) The amount involved and the results obtained.
   9) The experience, reputation, and ability of the attorney.
   10) The undesirability of the case.
   11) The nature and length of professional relationship with the client; and
   12) Awards in similar cases.

To further assist the trial courts, the First Circuit in *Furtado v. Bishop*, 635 F.2d 915 (1st Cir. 1980), adopted the approach developed by the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir. 1976), more recently endorsed and applied in *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980) (*en banc*). *See also Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575, 583 n.15 (5th Cir. 1980). "This approach recognizes that commenting on the twelve factors identified in *Johnson v. Georgia Highway Express, Inc.*, [488 F.2d 714 (5th Cir. 1974) setting out the factors adopted in *Greenblatt, supra*] may not in any real sense contribute to the rational setting of a fee; the comments are imprecise and the items overlap." *Furtado v. Bishop, supra*, at 920. However, *Furtado* does not abrogate the twelve factors in *Greenblatt*. Rather, it gives the trial judges the help that will assist them in honing the *Greenblatt* factors into "a useful analytical framework that can be applied by trial courts in all cases and can also lend itself to meaningful review . . . ." *Id.* at 920. The succinct recitation by the First Circuit of this theory warrants that it be quoted in full rather than capsulized. It reads:

> The starting point is to calculate the "lodestar": "The number of hours reasonably expended multiplied by a reasonable hourly rate." . . . This would involve separating out work done in relation to a firm's hierarchy, from senior partner to junior associate (and, we would add, including work that was or ought to have been assigned to a non-lawyer); eliminating time beyond that consistent with a standard of reasonable efficiency and productivity; and, after receiving documentation and possibly holding a hearing, assigning appropriate hourly rates for the kinds of work done by those at different levels of expertise. This results in a "lodestar" fee that then

is adjusted upward or downward to reflect the contingent nature of any fee (if such is not reflected in the hourly rate), delay in payment, quality of representation (i.e. an unusually good or poor performance above or below the skill already reflected in the hourly rates), exceptional (and unexpected) results obtained, etc. *Id.* at 920.

■   *Furtado's* two-part analysis preserves the twelve factors in *Greenblatt*, but puts them into a logical framework and orderly sequence. Some of the *Greenblatt* criteria are relevant to determining the "lodestar," "the number of hours reasonably expended multiplied by a reasonable hourly rate." These criteria include: the time and labor required, the experience and ability of the attorney, the customary fee in the community, awards in similar cases, and the novelty and difficulty of the questions presented. Other criteria are relevant to adjusting the "lodestar" up or down, the second half of the *Furtado* analysis. These factors include: preclusion of other employment, whether the fee was fixed or contingent, time limitations imposed by the client or the circumstances, the amount involved and results obtained, the undesirability of the case, and the nature and length of the professional relationship.

Guided by the relevant *Greenblatt* criteria, the Court will first determine the "lodestar" figure.[3] Because plaintiffs' counsel was a one-man operation, the language in *Furtado* relating to firm hierarchy is inapplicable here. Furthermore, it is undisputed that the time expended was consistent with a standard of reasonable efficiency and productivity. Therefore, *Furtado* does not require this Court to "eliminate" any excessive hours spent.

■   The next inquiry in determining the "lodestar" is whether the questions presented were particularly novel or difficult. I think that they were not. This case in-

---

**3.**  As stated earlier, defendants object only to the hourly rate requested by counsel and to any award for time spent litigating unsuccessful claims against the New Shoreham municipal

defendants. However, it would be improper for me to award fees without first analyzing all the factors outlined in *Furtado* and *Greenblatt*.

volved a straightforward police brutality question under § 1983. The law in this area is well settled and, no extensive research was required. The Court recognizes that one issue in this case was whether municipal officials had a legal duty to prevent any harm caused in their presence by state police to the plaintiffs. This question may have required an in-depth study of the legislative history of § 1983 and the parameters of *Monell v. New York Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), but not to a degree which impacts on a fee award. The legislative history of § 1983 was discussed extensively in both *Monell* and in this Court's opinion in *Leite v. City of Providence*, 463 F.Supp. 585 (D.R.I.1978), easing counsel's task.

Another "lodestar" criterion, borrowed from *Greenblatt*, is skill required to perform the legal services properly. Because this was a straightforward case, no exceptional skill was needed to properly place the issue before the Court and jury. However, the Court wishes to say that counsel's presentation was highly skilled.

Weighing all the preceding factors and looking to *Palmigiano* and *Lamphere*, as indicia of awards in similar cases,[4] I agree with the defendants that a lesser amount than awarded in *Lamphere* and *Palmigiano* should be awarded here. At this point in the analysis, I set the rate of $60.00 an hour for non-court time and $65.00 an hour for in-court time as the "lodestar." To me, this rate is unquestionably fair and reasonable.

■ The Court must now complete the second half of the *Furtado* analysis by determining whether the "lodestar" rate should be adjusted up or down.

First, the *Greenblatt* criterion of "preclusion of other employment" can affect the "lodestar" rate only if the hours spent on the case inherently precluded counsel from representation of certain other clients. However, the hours expended in this case were normal; indeed, the defendant does

not even question them. Such normalcy precludes special consideration of this criterion. Moreover, this finding also disposes of the need to give extra consideration to the time limitations imposed by the client or circumstances, another factor in *Greenblatt*. In this case there were no unusual or significant time limitations.

Another *Greenblatt* factor that may require adjustment of the "lodestar" is the nature and length of the professional relationship with the client. However, I see nothing to be considered here. Evidently, the plaintiffs were one-time clients who looked for a good lawyer and fortunately were referred to such an advocate. This happy ending is nice, but it does not warrant special consideration in the awarding of fees.

The next relevant criterion is the amount involved and the results obtained. I agree that plaintiffs' counsel was quite successful in this case. In his post trial memorandum, at page 8, counsel correctly observes that "[t]he total medical bill incurred by both plaintiffs was $35.00. Neither plaintiff testified to any long-term disability but for, in the case of one plaintiff, his inability to engage in football practice for a period in September of 1975. Notwithstanding these facts, the jury returned a verdict of $25,-000." This award was subsequently reduced by me to $10,000.00; the First Circuit affirmed. The substantial damage award won by counsel is certainly a plus and must be weighed favorably.

The factor of undesirability of the case, however, does not have a favorable effect on the "lodestar" figure. There was no particular publicity engendering any great public reaction. If anything, there is public support for this kind of action.

I must next consider whether the case was litigated on a fixed- or contingent-fee basis. Plaintiffs' counsel states in his memorandum at page 8 that his agreement with the plaintiffs was of a purely contingent

---

4. The Court does not hold that the awards in *Lamphere* and *Palmigiano* represent maximum allowable fees. The rates established in these

cases may be proved to be unreasonably low in a particular case through testimony of a sort not introduced in the present action.

nature. This statement, however, is not convincing given the fact that counsel is a private attorney not representing indigent clients. In *Lund v. Affleck*, 442 F.Supp. 1109, 1116 (D.R.I.1977), the Court said:

> The only fee available in welfare litigation is pursuant to 42 U.S.C. § 1988 which, by its very terms, makes such fee contingent on the success of the litigation. Private attorneys have several options: take the case on a purely contingency basis as provided in the statute and receive payment only if successful, arrange for compensation from the client if unsuccessful, or refuse the case. Only the first option is open to legal service attorneys. They are obligated to represent all the poor and reimbursement is completely contingent on success.

Despite my doubts, however, I will assume that counsel litigated plaintiffs' cause on a purely contingent basis.

██ As I stated in *Palmigiano, supra*, at 737, "Certainly the contingency factor is cause for a more liberal application of the consideration guiding a court in awarding a fee; Congress intended, through the fees award act, to encourage civil rights litigation to vindicate important rights guaranteed by law." However, should contingency play a part in setting an award when the private attorney opts to take a case on a purely contingent basis from a financially sound client? Though the ability of a client to pay does not negate the need to weigh the contingency factor, however, it does not play as important a role as in the representation of indigent clients. True, the public interest in the vindication of civil rights violations is not measured by the victim's economic status and therefore the contingency factor should be considered. But, as I see it, the additional amount a lawyer should receive because of such contingency should be measured in relation to the victim's ability to pay in the first instance. When an attorney represents a client of sufficient means, his receipt of some fee is assured unless he decides otherwise, and if so he has no one to blame but himself should he lose. As discussed in *Lamphere*, the contingency factor cannot be a guise for

an award of punitive damages. Though the contingent nature of the case is only one of the many considerations, it all too often is overemphasized to justify an unwarranted request by counsel.

In this trial, I received no evidence as to the financial means of the plaintiffs. They were young men dependent on their parents, but it was obvious that they were not emancipated and were from a family of fair economic status. At the time of the incident, the parents had rented a vacation house on Block Island. I conclude that the contingency factor in this case warrants an upward grade of the "lodestar," but only in some small percentage. Probability of success was not as great in this case as in *Lamphere*, in which I upgraded the fee by 10% because of the contingency factor. Furthermore, this case was totally contingent, whereas *Lamphere* was not. Finally, this case is not as complex as was *Lamphere*. On balance, therefore, the contingent nature of this case should not raise the award as much as it did in *Lamphere*.

I can summarily dispose of the remaining factors in *Greenblatt* and *Furtado* and how they affect the "lodestar" figures in this case. First, as for delay in payment, this case was tried in May 1979 and affirmed by the First Circuit in October 1980. To date, approximately two and one-half years have elapsed since counsel tried this case. At today's interest rates, had the fee being awarded today been invested in 1979, it would have accumulated substantial interest. Second, the quality of representation, as I have already stated, was good, but not above the skill already reflected in the hourly rate. Third, the criterion of "exceptional and unexpected results," specifically mentioned in *Furtado*, has already been discussed above in the analysis of the *Greenblatt* criterion of "amount involved and results obtained."

I have carefully considered all the factors that might raise or lower the "lodestar" in this case. I conclude that there should be an upgrading of the "lodestar" figures by 10%.

### Hours Spent By Plaintiffs' Counsel on New Shoreham Defendants

The defendants argue that "an award against the liable defendants for activities performed by plaintiffs' counsel in furtherance of an unsuccessful claim against other defendants would be outside the letter and intent of the Civil Rights Attorneys' Fees Awards Act. . . ." Defendants' Memorandum at page 6. The plaintiffs were not "prevailing parties" as to the municipal defendants and, so the defendants claim, a fee award which includes time spent on that part of the case would be unjust. Defendants term the naming of the New Shoreham defendants a "shotgun approach" for which no fee consideration should be given.

However, the matter is not as simple as defendants argue. The incident in question occurred on Block Island in the Town of New Shoreham where the defendants were the town treasurer, its police chief and one of its police officers. During the summer months, the State Police stationed two of their officers on the island to assist the local officials who would otherwise not be able to cope with the influx of summer residents. The defendants found liable were two such officers. In the course of the trial, the municipal defendants moved to be dismissed from the case because the evidence did not establish that they, though present, directly participated in the alleged brutalization of the plaintiffs. They argued that, as municipal officials, they had no duty or authority to supervise the state police and, thus, could not be held liable under 42 U.S.C. § 1983 as interpreted in *Monell v. New York Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and *Leite v. City of Providence,* 463 F.Supp. 585 (D.R.I.1978). In a Memorandum and Order dated May 7, 1979 that expanded on a ruling delivered orally in open court during trial on defendants' motion pursuant to Fed.R.Civ.P. 50(a), I dismissed the municipal defendants. After stating my reasoning, I concluded:

> In light of the legislative history of 42 U.S.C. § 1983, one may safely assume that Congress never intended for municipalities to be liable for the legal violations of other parties over which they had no explicit or direct control. Of course, municipalities themselves cannot recklessly or intentionally contravene the law and they are liable for keeping the peace as the state dictates. In the present case, however, the state has never imposed the duty upon the municipal officials to supervise state officials. Thus, this is not a case where supervising officials recklessly or intentionally acquiesced in a subordinate's illegality. *Compare Leite, supra.* To the contrary, state law gives local officials no supervisory authority over state officials. Nor, in light of the legislative history, can section 1983 be read as independently imposing such an affirmative duty to supervise.

The Court is nevertheless convinced that the efforts which plaintiffs' counsel undertook in seeking to hold the municipal defendants liable were also reasonably necessary to the preparation of the case against the state police officers. In the course of pre-trial discovery, it was incumbent upon plaintiffs' counsel to explore the degree of participation of the municipal defendants in the incident in question. At trial, the evidence adduced from the municipal defendants was useful in challenging the credibility of the state troopers' testimony.

Thus, I cannot accept the defendants' insistence that the suit should be fractionalized into successful and unsuccessful claims. "[C]ourts should not require attorneys (often working in new or changing areas of the law) to divine the exact parameters of the court's willingness to grant relief." *Stanford Daily v. Zurcher,* 64 F.R.D. 680, 684 (N.D.Cal.1974), *aff'd,* 550 F.2d 464 (9th Cir. 1977). *See Northcross v. Board of Education,* 611 F.2d 624, 635–36 (6th Cir. 1979) (once it is determined that plaintiffs prevailed, they are entitled to recover attorney's fees for all time reasonably spent on a matter and it is wholly irrelevant that some of that time was spent in pursuing research on issues that were ultimately unproductive, rejected by the Court or mooted by

intervening events unless the positions asserted are frivolous or in bad faith). *See also Palmer v. Rogers*, 16 F.Empl.Prac.Dec. 702, 707 (D.D.C.1975) ("[t]he policy underlying the fee provisions of Title VII is best served by encouraging plaintiffs to seek the broadest relief they feel, in good faith, they are entitled to.")

Certainly the plaintiffs' position was not "frivolous or [asserted] in bad faith." The interweaving of the conduct of the municipal and state police officers precludes the sort of dissection of claims and litigation efforts that defendants request. I will therefore allow an award for the time spent litigating against the municipal defendants.

*Hours Expended*

If I correctly interpret counsel's affidavit, he is seeking compensation for a total of 172¼ hours of non-court time, and 33 hours of in-court time. Defendants object to 61.58 of these hours on the grounds that they represent time spent on the claims against the New Shoreham defendants. This objection has been overruled. Furthermore, defendants also object to an additional 2 hours and 25 minutes of non-court time. The 25 minutes went to preparation and drafting of a notice to take a deposition, and the 2 hours is for travel time to the First Circuit. Excepting for the 25 minutes, which counsel has accounted for elsewhere, I see no merit to these objections.

Based on the foregoing, I award the following fee:

| | | |
|---|---|---|
| total non-court time of 171.8 hours at $60.00/hour | = | $10,308.00 |
| total in-court time of 33 hours at $65.00/hour | = | 2,145.00 |
| | Total | $12,453.00 |
| Upward adjustment of 10% | | 1,245.00 |
| | Total Award: | $13,698.00 |

An order will be prepared accordingly.